# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

EILEEN PARLATO,           )    3:22-CV-01094 (SVN)
    *Plaintiff*,         )
                   )
    v.               )
                   )
TOWN OF EAST HAVEN     )
    *Defendant*.        )    November 26, 2024

## RULING AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Sarala V. Nagala, United States District Judge.

In this employment discrimination action, Plaintiff Eileen Parlato alleges that Defendant Town of East Haven ("Town") discriminated against her on the basis of gender in its interview and selection process for the role of Assistant Chief of the East Haven Fire Department ("EHFD"). Plaintiff alleges gender discrimination claims against the Town under Title VII, 42 U.S.C. § 2000e *et seq.* (Count 1), the Equal Protection Clause of the U.S. Constitution (Count 3), and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46A-60 *et seq.* (Count 2).[1]

Defendant seeks summary judgment on these claims, contending primarily that, based on the undisputed material facts, Plaintiff cannot demonstrate that Defendant failed to promote Plaintiff to Assistant Chief due to Plaintiff's gender.

For the reasons set forth below, Defendant's motion is DENIED as to Plaintiff's Title VII and CFEPA claims and GRANTED as to Plaintiff's equal protection claim.

---

[1] Plaintiff's claims for retaliation under Title VII and the CFEPA (Counts 4 and 5) were previously dismissed. *See* ECF No. 61.

I.     **FACTUAL BACKGROUND**[2]

A.  <u>General Background</u>

East Haven's Fire Commission ("Commission") has general jurisdiction over the Town's Fire Department under the East Haven Charter.  Pl.'s L.R. 56(a)(2) St. ¶ 3.  As part of this jurisdiction, the Commission has the authority to appoint all EHFD employees except the Fire Chief, who is instead appointed by the Town's mayor.  *Id.* ¶¶ 3, 4.

Matthew Marcarelli was appointed Fire Chief of EHFD by the Town's mayor in 2017, following an oral examination and an interview.  *Id.* ¶ 4.  Charles Licata became Assistant Chief ("AC") of EHFD in 2008 after passing a written examination.  *Id.* ¶ 5.  At that time, the only job qualification required for AC was eight years of service with EHFD.  *Id.* ¶ 6.  In August of 2021, AC Licata announced that he would retire the following month, creating a vacancy in the AC position.  *Id.* ¶ 7.

Plaintiff began working for the EHFD in 1993 when she was first hired as a firefighter.  *Id.* ¶ 1.  According to Plaintiff, she was the first EHFD female career firefighter.  Pl.'s L.R. 56(a)(2) St. Add. Mat. Facts ¶ 1.  Plaintiff was promoted to Battalion Chief in 2005 and held that role until her retirement in 2022.  Pl.'s L.R. 56(a)(2) St. ¶ 1.   Plaintiff states that she earned the promotion to Battalion Chief following a hybrid written and oral examination, in which she earned the top score on the written portion of the examination.  Pl.'s L.R. 56(a)(2) St. Add. Mat. Facts ¶ 6.  During her tenure at the EHFD, Plaintiff stated that she was not "discriminated against."  Pl.'s L.R. 56(a)(2) St. ¶ 2.  Plaintiff also contends, however, that she did "experience challenges as a woman in a male-dominated industry."  *Id.*

---

[2] The factual background is taken primarily from Plaintiff's Local Rule 56(a)(2) Statement, ECF No. 88 ("Pl.'s L.R. 56(a)(2) St.").  The facts are undisputed, unless otherwise indicated.

While working as Battalion Chief, Plaintiff contends that she worked closely with then-AC Licata, including by "perform[ing] key portions of [his] job." Pl.'s L.R. 56(a)(2) St. Add. Mat. Facts ¶ 10; *see also id.* ¶¶ 9, 11. Plaintiff also notes that AC Licata viewed her as "his natural successor." *Id.* ¶ 14. Plaintiff states that she repeatedly expressed to Chief Marcarelli and Licata her "long-standing genuine interest" in applying to be AC. Pl.'s L.R. 56(a)(2) St. ¶ 46.

B. <u>Assistant Chief Hiring Process</u>

*1. Assistant Chief Job Description and Requirements*

After AC Licata announced his retirement, Chief Marcarelli drafted a new job description for the AC position. *Id.* ¶ 8. This new description differed significantly from the one used when Licata was promoted, both in the description of the role and the necessary qualifications; it included a list of "Required Knowledge Skills and Abilities," provided examples of key duties, and, for the first time, opened the position to both internal and external candidates. *Id.* ¶¶ 8, 10(a)–(b), 28. The job description included separate experience requirements for internal and external candidates. *Id.* ¶¶ 10(a)(i)–(iii). Internal candidates needed at least 10 years' experience with EHFD and to hold the rank of Captain or higher, while external candidates needed at least 15 years' experience, 10 of which reflected "progressively responsible supervisory experience," and a ranking of at least Battalion Chief. *Id.* ¶¶ 10(a)(i)–(ii).

Additionally, all candidates were required to be certified as Fire Officer I or higher as defined by the National Fire Protection Association ("NFPA") standards. *Id.* ¶¶ 10(b)(i)–(ii). Defendant asserts that Fire Officer I was the level chosen as the job requirement to ensure Plaintiff could apply for the position; Plaintiff asserts that the Chief did not recommend that Fire Officer III or IV be required, so that *all* internal candidates—none of whom had Fire Officer III or IV certifications—would be eligible. *Id.* ¶¶10(b)(iii)–(iv).

Defendant asserts that before the Town listed the updated job description and requirements, Chief Marcarelli presented it to Board of Fire Commissioners ("BOFC") for review and approval. *Id.* ¶ 9.  Plaintiff admits that the BOFC voted on and approved the job description, but also states that the meeting minutes do not discuss the contents of the job description, beyond noting that one commissioner moved to approve the description with "restrictions."  *Id.*

### 2. *The Application and Oral Examination Process*

In addition to the changed job description and requirements, Plaintiff contends that Chief Marcarelli also changed the exam from a civil service exam to a non-civil service one.  Pl.'s L.R. 56(a)(2) St. Add. Mat. Facts ¶ 23.[3]  Chief Marcarelli also chose to depart from past practice of relying upon only a written exam for this position, recommending instead that the BOFC permit an oral examination conducted by a panel of fire department chiefs from neighboring towns.  Pl.'s L.R. 56(a)(2) St. ¶¶ 5, 11.  It is undisputed that, in making the recommendation that the examination be conducted only orally, Chief Marcarelli was unaware of Plaintiff's prior success on written examinations.  *Id.* ¶ 12.  Defendant asserts that oral exams are standard practice for positions like this in Connecticut, but Plaintiff disagrees, asserting that the AC position previously only required a written exam.  *Id.* ¶¶ 11, 13.  Defendant states that the BOFC approved the oral candidate assessment method; Plaintiff admits that the Board approved the description, but notes that its meeting minutes do not describe that the oral format was specifically approved.  *Id*. ¶ 11.

In addition to Plaintiff, Christopher Rosa, another EHFD Battalion Chief, applied for the AC position.  *Id.* ¶ 48.  At the time of the oral examination associated with the AC hiring process,

---

[3] The alleged change of the examination from being governed by the civil service rules to non-civil service rules was a central feature of Plaintiff's presentation at oral argument, but Defendant claimed to be surprised by this theory. Given Defendant's apparent surprise, and because other evidence in the record independently supports denial of Defendant's summary judgment motion as to Plaintiff's Title VII and CFEPA claims, the Court does not address the issue of whether the position was governed by the civil service rules in this ruling.

Rosa had seventeen years' experience as a "professional firefighter" and five years' experience as a "volunteer," and held a Fire Officer II certification. *Id.* ¶ 48. He had served as Battalion Chief for eleven months, although Plaintiff asserts he was on leave for two of those eleven months. *Id.* ¶ 48. In addition to these qualifications, Defendant asserts that Rosa had completed twenty-two courses at the Connecticut Fire Academy ("Academy") and had earned certifications or certificates in fifteen competencies that Plaintiff did not have. *Id.* ¶ 49. Plaintiff contends that the majority of these twenty-two courses are basic firefighter classes that she also took as a firefighter with EHFD, although she did not necessarily receive certificates of completion for them. *Id.* Rosa also attended the United States Air Force Non-Commissioned Officer Leadership School and had completed the iLead Program at the Academy, which Plaintiff contends was a course for newly-promoted officers that did not exist when she became a Battalion Chief in 2005. *Id.* ¶ 53.

Plaintiff, for her part, completed nine courses at the Academy and earned certifications or certificates in four competencies that Rosa did not have. *Id.* ¶ 50. Beyond education at the Academy, Plaintiff had taken three courses at the University of New Haven toward a Bachelor of Science Degree in Arson Investigation in 2005 but did not complete that degree. *Id.* ¶ 52.

Rosa reported that he spent approximately 100 hours preparing for the oral examination. *Id.* ¶ 27. Defendant asserts that Plaintiff spent only "five to six" hours preparing for the examination; Plaintiff contests this characterization, noting that while she spent that much time preparing "right before the interview process," she had spent years preparing through her various roles within EHFD. *Id.* ¶ 30.

The oral examinations took place on September 24, 2021. *Id.* ¶ 21. Of the seven candidates who participated, Plaintiff was the only female candidate. *See* ECF No. 79-24 (interview score sheet). The interview panel selected by Chief Marcarelli was made up of Ryan Dunn, Deputy Fire

Chief of the Meriden Fire Department; Joseph Czentnar, Chief of the Wallingford Fire Department; and John Woron, Chief of the Middletown Fire Department. Pl.'s L.R. 56(a)(2) St. ¶ 18(a)–(c). Plaintiff asserts that Chief Marcarelli sought to find a female chief to serve as an oral examiner to make Plaintiff "comfortable," but was unable to identify any. Pl.'s L.R. 56(a)(2) St. Add. Mat. Facts ¶ 33.

The oral exam itself consisted of fourteen standard questions drafted by Chief Marcarelli based on a particular NFPA standard and involving factual matters related to the town and EHFD. Pl.'s L.R. 56(a)(2) St. ¶¶ 16, 22. Plaintiff asserts that although initially Chief Marcarelli drafted a question related to diversity, he subsequently removed that question. *Id.* ¶ 33. Every applicant was asked these questions[4] and then individually scored by each member of the panel of interviewers on a scale of 1–10. *Id.* ¶ 23.

The panel was given the list of questions drafted by Chief Marcarelli, paper for note taking, exam instructions, the AC job description, a list of the candidates, and the interview schedule. *Id.* ¶ 22. The parties dispute whether the panel was given candidates' résumés. *Id.* Plaintiff contends that applicants were instructed that they "may bring a copy of [their] r[é]sum[é] and cover letter to [their] interview to present to the panel." *Id.* ¶ 19; Pl. Ex. 13, ECF No. 87-24, at 2–3. Plaintiff also states that the panel was instructed to follow the exam instructions closely and not deviate from the oral examination questions as written, so as to ensure a fair process. Pl.'s L.R. 56(a)(2) St. Add. Mat. Facts ¶¶ 35, 36. Plaintiff further states that examiners were not given guidance as to what constituted a correct answer for the majority of the questions, making the oral exam scores

---

[4] It is undisputed that the same questions were asked of each candidate. However, different paragraphs in Plaintiff's Local Rule 56(a)(2) Statement reflect a different total number of questions. *Compare* Pl.'s L.R. 56(a)(2) St. ¶ 22 (stating that the interview panel was given 14 questions) *with* Pl.'s L.R. 56(a)(2) St. ¶ 23 (stating that the interview panel asked each candidate "the same ten questions"). The total number of questions the interview panel was provided or asked of the candidates is not central to the Court's analysis.

inherently subjective. *Id.* ¶¶ 37–39; *see also* Pl.'s L.R. 56(a)(2) St. ¶ 16.  After each interview, the panel discussed the scores they gave each candidate.  Pl.'s L.R. 56(a)(2) St. ¶ 23.

Following the oral examination, the panel gave Plaintiff its lowest score among the candidates (78.3/100), while Rosa earned the second-highest score (91.3/100).  *Id.* ¶¶ 34, 36, 37.  Plaintiff asserts that the panelists' notes on both her interviews and Rosa's suggest gender bias in the panelists' evaluation of her answers and their scoring.  *Id.* ¶ 34.  She further asserts that the panel permitted Rosa to bring in a five-year plan for the EHFD, in violation of the instructions all candidates received regarding what they may bring to the oral examination,[5] *id.* ¶ 19, and that, according to another EHFD employee, Rosa reported being coached on the answer to one question and asked an additional question beyond those asked of other candidates.  *Id.* ¶ 23.

The parties dispute whether the BOFC voted or approved using the "Rule of Three," a process by which the top three scorers from the oral examination would make it to the second round of the interview process to be interviewed by the BOFC.  *Id.* ¶¶ 14, 15.  Plaintiff states that job description simply read that candidates would participate in "an oral examination 'followed by' an interview" with the Board of Fire Commissioners.  *Id.* ¶ 15.  It is undisputed that the panel was not informed that only the top three scoring candidates on the oral examination would continue on to the next round interview before the BOFC.  *Id.*  ¶ 31.

In the end, however, only the top three oral examination score recipients, including Rosa, were invited to interview with the BOFC.  *Id.* ¶ 39.  Rosa was the only internal candidate advanced to the second round.  *Id.*  Plaintiff was informed by letter that she was not selected to move forward

---

[5] Defendant asserts that Plaintiff relies on previously undisclosed expert testimony to support her assertion that permitting written materials during an oral exam is irregular.  *See* Def.'s Reply, ECF No. 91 at 11–12.  The Court need not decide the question of admissibility of the opinion here.  Rather, it considers only Plaintiff's argument that Rosa was permitted to bring a five-year plan into the oral examination when parties were instructed that they "may bring a copy of [their] r[é]sum[é] and cover letter to [their] interview to present to the panel."  Pl.'s L.R. 56(a)(2) St. ¶ 19; Pl. Ex. 13, ECF No. 87-24 at 2–3.

to the BOFC interview stage.  *Id.* ¶ 38.  Plaintiff states that the letter provided three reasons why she did not move forward: (1) "overall accomplishments as delineated in the r[é]sum[é];" (2) "fire department leadership experience" and (3) "performance in the interview process."  *Id.*

The BOFC ultimately offered the AC position to Rosa.  *Id.* ¶¶ 41, 42.

C.  Other Asserted Incidents of Gender Discrimination

Plaintiff points to other asserted incidents of gender discrimination engaged in by Chief Marcarelli.  On at least one occasion, Chief Marcarelli used the "C" word in a conversation with AC Licata to describe a woman who had been taking photos of his daughter at a beach.  *Id.* ¶ 54. Plaintiff heard him use the word, and the Chief apologized to her for his language.  *Id.* ¶ 55. Plaintiff also claims that Chief used this word on at least one other occasion to describe a male EHFD employee who had an "argumentative attitude."  *Id.* ¶ 56.

Additionally, during his tenure as Chief, Marcarelli offered jobs to only two female firefighters, only one of whom was hired, as the other was determined to be "not hireable." *Id.* ¶ 43.  Finally, the parties contest whether there was unfair treatment of a transgender woman under Marcarelli's tenure, *id.* ¶ 44, and whether male and female firefighters received different disciplinary actions, *id.* ¶ 45.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A disputed fact is material only where the determination of the fact might "affect the outcome of the [law]suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  With respect to genuineness, "summary judgment will not lie if

the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. A movant, however, "need not prove a negative when it moves for summary judgment on an issue that the [non-movant] must prove at trial. It need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 324). The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson*, 477 U.S. at 249. If the non-movant fails "to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation and internal quotation marks omitted). "Only when reasonable minds could not differ as to the

import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

### III.    TITLE VII AND CFEPA CLAIMS

For the reasons discussed below, Defendant's motion is DENIED as to Plaintiff's Title VII and CFEPA claims.

A. <u>Legal Standard</u>

Title VII of the Civil Rights Act of 1964 and the CFEPA prohibit discrimination in employment on the basis of a person's sex. 42 U.S.C. § 2000e-2(a)(1); Conn. Gen. Stat. § 46a-60. Both claims are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Bart v. Golub Corp.*, 96 F.4th 566, 569 (2d Cir. 2024). Although the *McDonnell Douglas* framework effectively shifts the "intermediate evidentiary burdens" between the plaintiff and defendant, "'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

Under the *McDonnell Douglas* burden-shifting framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination or retaliation. *Burdine*, 450 U.S. at 252–53. The plaintiff's burden at this step is *de minimis*. *Id.* at 253 (noting that the plaintiff's burden of satisfying a *prima facie* case is "not onerous"). If the plaintiff satisfies her *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory or non-retaliatory reason for the challenged employment action. *Id.* at 254.

If the defendant articulates a legitimate, non-discriminatory or non-retaliatory reason for its action, the burden shifts back to the plaintiff. *Bart*, 96 F.4th at 576. At step three, the plaintiff

"may, but need not, show that the employer's stated reason was false, and merely a pretext for discrimination; a plaintiff may also satisfy this burden by producing other evidence indicating that the employer's adverse action was motivated at least in part by the plaintiff's membership in a protected class." *Id.*

The final step of the *McDonnell Douglas* framework requires the Court to examine the entire record—including evidence from the plaintiff's *prima facie* case, additional evidence suggesting pretext, and other evidence of the defendant's discriminatory or retaliatory intent—and "determine whether the plaintiff could satisfy [her] ultimate burden of persuading the trier of fact that the defendant intentionally discriminated" against her. *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000) (internal quotation marks and citation omitted); *see also Burdine*, 450 U.S. at 256 (explaining that the plaintiff's third-step burden to demonstrate pretext "merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination"). "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors," including the "strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false," and any other properly considered evidence that supports the employer's case. *Reeves*, 530 U.S. at 148–49. The Second Circuit has emphasized "the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)).

B. <u>Discussion</u>

The parties agree that Plaintiff has demonstrated a *prima facie* case of gender discrimination, and that Defendant has put forth a legitimate, non-discriminatory reason for failing

to promote her to the AC position:  that she prepared inadequately for the oral examination and thus scored the lowest.  *See* Def.'s Mot. for Summ. J., ECF No. 77 at 17–19; Pl.'s Opp. to Def.'s Mot. for Summ. J., ECF No. 87 at 29.  Therefore, the Court focuses on step three of the *McDonnell Douglas* analysis—whether Plaintiff could satisfy her burden of persuading the trier of fact that Defendant intentionally discriminated against her.  It concludes that Plaintiff has met that burden, and that summary judgment is therefore inappropriate.

The Court reaches this conclusion after examination of the full record before it.  Plaintiff has put forth sufficient evidence, when taken in combination, from which a reasonable jury could conclude she was discriminated against because of her gender.  This evidence includes: (1) the (changed) process by which Defendant considered candidates for the AC position; (2) the discrepancy in years of experience between her and Rosa; (3) Defendant's shifting rationales for denying her the AC position; and (4) Chief Marcarelli's past actions suggesting a pattern of gender discrimination.

First, Plaintiff provides evidence to support her contention that the AC hiring process as a whole demonstrates evidence of gender bias, such that a reasonable jury could infer a discriminatory motive on behalf of the Defendant. These include Chief Marcarelli's decisions to change the exam format from written to oral, to omit the interview question related to diversity and EHFD, and to rely on the Rule of Three to preclude Plaintiff from advancing to an interview with the BOFC.  When considered in combination, these decisions concerning the hiring process could support a verdict in Plaintiff's favor.

To start, although "'there is nothing unlawful about an employer[] basing its hiring [or promotion] decision on subjective criteria, such as the impression an individual makes during an interview, . . . an employer may not use wholly subjective and unarticulated standards to judge

employee performance for the purposes of promotion.'" *Kallinikos v. New York State Dep't of Corr. & Cmty. Supervision*, 481 F Supp. 3d 76, 86 (E.D.N.Y. 2020) (quoting *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 104 (2d Cir. 2001)) (internal quotation marks omitted), *superseded in part and on other grounds by* Fed. R. Civ. P. 37(e)). The Second Circuit has cautioned that "courts must give particular scrutiny to 'subjective evaluation[s],' because (1) 'any defendant can respond to a discrimination charge with a claim of some subjective preference or prerogative and, if such assertions are accepted, prevail in virtually every case' and (2) a discriminatory consideration such as age could play into the 'formation of subjective impressions.'" *Weiss v. JP Morgan Chase & Co*, 332 Fed. Appx. 659, 661 (2d Cir. 2009) (quoting *Byrnie*, 243 F. 3d at 104–06).

Here, a reasonable jury could infer gender discrimination from various decisions made by Chief Marcarelli about the AC hiring process, including his decision to switch from a written examination to an oral examination administered by fire department leaders of his choosing. Each panel member confirmed in deposition testimony that his evaluation of candidates was based on his "subjective" impression of the candidate's performance during the interview. *See* ECF Nos. 87-5 at 86 (Czentnar); 87-6 at 159 (Dunn); 87-11 at 65 (Woron). To take one example, after being asked about what she had done to prepare herself for the AC role, Plaintiff responded: "I was born," which the examiners found to be an "awkward" and "strange" answer. Pl.'s L.R. 56(a)(2) St. ¶ 34. Rosa, on the other hand, similarly stated he had been "preparing his entire career," and drew no apparent criticism. *Id.* Both statements expressed confidence about being prepared for the role, but appear to have been interpreted differently by the male examiners. As the Second Circuit noted in *Byrnie*, discriminatory considerations such as gender bias may have informed the examiners' differing interpretations of female and male candidates' responses. *Byrnie*, 243 F.3d

at 106.  Additionally, while Defendant argues the panel members' notes reflect "clear and specific" evidence that Rosa performed better in the examination, ECF No. 77 at 23 (quoting *Laiscell v. Board of Educ.*, No. 20-cv-1463 (VLB), 2023 WL 6200325, at *9 (D. Conn. Sept. 22, 2023)), the evidence does not so clearly favor Rosa to render judgment as a matter of law appropriate.  Indeed, the panel members' notes contain certain positive references to Plaintiff's examination.  *See* Pl.'s L.R. 56(a)(2) St. ¶ 34 (referencing her hands-on leadership and active listening, her being mentored by the then-AC, and her knowledge of the collective bargaining agreement).

That the examination questions were based on NFPA standards does not mean the examination was not subjective.  It is undisputed that the panel members were not provided with guidelines as to what would be a correct answer for the majority of the questions.  Without providing the panel with standardized answers for every question against which they could measure the candidates' answers, it does not matter that the questions were based on NFPA standards.  In other words, it is the lack of standards to guide evaluation of candidates' answers that raises subjectivity concerns; the selection of questions based on NFPA standards does not cure this issue.

Moreover, the Chief's decision to propose, and then eliminate, a question about what diversity means to the candidate and how the EHFD could broaden diversity within its ranks, is likewise evidence that could suggest gender discrimination.  As the only female candidate being interviewed for AC, Plaintiff asserts that she stood to benefit from the inclusion of a question about diversity.  *See* ECF No. 87 at 41; *see also* Pl.'s L.R. 56(a)(2) St. ¶ 33.  Particularly where, as here, the interview panel was made up only of men, for a position in a profession that is male-dominated, and the exam structure was shifted from a more objective structure to a more subjective one that eliminated a question about diversity, a reasonable jury could infer gender discrimination was

14

afoot. *See McInnis v. Town of Weston*, 375 F. Supp. 2d 70, 81, 83–84 (D. Conn. 2005) (denying summary judgment in age discrimination case where the plaintiff argued that the defendant manipulated the oral portion of an exam to disadvantage older applicants and to favor younger ones, such that the plaintiff's score "did not objectively reflect their relative qualifications").

Finally, the jury can also weigh whether use of the "Rule of Three" is indicative of gender discrimination against Plaintiff. The parties dispute whether the BOFC approved the process by which only the candidates with three highest scores from the oral examination would advance to the interview with the BOFC. *See* Pl.'s L.R. 56(a)(2) St. ¶ 14. Plaintiff contends that the job posting suggested *all* candidates would participate in "an oral examination 'followed by' an interview" with the Board of Fire Commissioners." *Id.* ¶ 15. When taken in combination with the other facts discussed in this ruling, the apparent discrepancy between the job posting's description of the process and the process actually employed—which deprived Plaintiff, the only female candidate, of the opportunity to make her case for the promotion to the BOFC—could support an inference of gender discrimination.

Second, a reasonable jury could determine that the qualification discrepancies between Plaintiff and Rosa indicate that gender bias influenced Defendant's decision not to hire Plaintiff as AC. For a discrepancy in qualifications alone to create a genuine issue of material fact for trial, Plaintiff would have to demonstrate that her credentials were "so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Byrnie*, 243 F.3d at 103 (cleaned up). In making that assessment, "the [C]ourt must respect the employer's unfettered discretion to choose among qualified candidates." *Id.* But *Byrnie* also makes clear that, "just because the discrepancy between [the candidates'] qualifications does not on its own have the

strength to create a material issue of fact, that does not mean the discrepancy is stripped of all probative value." *Id.* Any such discrepancy may be considered as evidence of pretext. *Id.*

Based on the criteria set forth in the AC job description, both Plaintiff and Rosa qualified, at base, for the position. *See* Pl.'s L.R. 56(a)(2) St. ¶ 25. The Court therefore cannot conclude, as Plaintiff urges, that the qualification discrepancy between them is sufficiently stark to support denial of Defendant's summary judgment motion on its own. *See* ECF No. 87 at 48. But the Court (and a reasonable jury) can consider the discrepancy in qualifications as part of the entire record. *See Byrnie*, 243 F. 3d at 103. Given that Plaintiff had served as Battalion Chief for nearly fifteen years longer than Rosa and had worked closely with Licata on AC-related tasks, *see* ECF No. 87 at 11, 47–48, a reasonable jury could find the selection of Rosa despite the discrepancy in qualifications to be probative of gender bias.[6]

Third, a reasonable jury could infer gender discrimination from Defendant's shifting rationale for its decision not to permit Plaintiff to interview before the BOFC. Changing rationales for an employment decision permit an inference of discrimination. *See, e.g.*, *Belfi v. Prendergast*, 191 F.3d 129, 139 (2d Cir. 1999). Here, the Town's rejection letter stated three reasons for not moving Plaintiff forward in the AC interview process—namely 1) "overall accomplishments on r[é]sum[é]," 2) "fire department leadership experience," and 3) "performance in the interview process." Pl.'s L.R. 56(a)(2) St. ¶ 38; Pl.'s Ex. 18, ECF No. 87-29 at 2. Defendant now contends that Plaintiff was not moved forward to interview before the BOFC solely because of her low score on the oral examination. *See* ECF No. 77 at 4–5. This change in rationale could be viewed as suspect to a jury where, as here, it is disputed whether the oral examination panel received

---

[6] Defendant relies heavily upon this Court's decision in *Wynn v. New Haven Bd. of Educ.*, No. 3:21-cv-925 (SVN), 2024 WL 1157148, *7 (D. Conn. Mar. 18, 2024), to argue that Plaintiff's qualifications did not so "dwarf" Rosa's as to be considered evidence of gender discrimination. But in *Wynn*, the plaintiff had *less* relevant experience than the other candidates. Here, it is undisputed that Plaintiff has several *more* years of supervisory experience than Rosa.

Plaintiff's résumé, and where Plaintiff had such extensive leadership experience within EHFD, particularly when compared to Rosa's more limited leadership experience.  This is not a simple dispute over how different factors were weighed by the employer, as Defendant suggests.  *See* ECF No. 77 at 18–19 (citing *Hernandez v. Office of the Comm of Baseball*, No. 18-CV-9035 (JPO), 2021 WL 1226499, at *7, 9 (S.D.N.Y. Mar. 31, 2021), *aff'd*, No. 22-343, 2023 WL 5217876 (2d Cir. Aug. 15, 2023)).  Rather, it is a material dispute regarding the true reasons for choosing a candidate other than Plaintiff, which is central to Plaintiff's claims of discrimination.

Fourth and finally, Chief Marcarelli's actions and words are circumstantial evidence of discrimination the jury can consider.  Plaintiff and Defendant dispute facts and the underlying reasons for certain actions related to evidence of an alleged pattern of Chief Marcarelli's gender discrimination. These include the number of times Chief Marcarelli used the "C" word at work, whether Chief Marcarelli discriminated against other female employees, and whether Chief Marcarelli demonstrated gender bias when he sought to find a woman to serve on the interview panel to make Plaintiff feel more comfortable during the interview process.  These are factual disputes not well-suited to resolution at summary judgment.

With respect to whether the Chief's one undisputed use of the "C" word in relation to his daughter's situation is probative of discrimination, the Court holds that it is at least somewhat probative at this juncture.  The Court must consider four factors to make this determination:  "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the context of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)."  *Henry v. Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134, 149 (2d Cir. 2010); *see also Johnson v. L'Oréal*

*USA*, No. 21-2914-cv, 2023 WL 2637456, at *4 (2d Cir. Mar. 27, 2023) (summary order). These factors weigh slightly in favor of the remark being probative. First, Chief Marcarelli was Plaintiff's supervisor, Chief of the EHFD, and the person responsible for recommending certain decisions about the AC hiring process to the BOFC. Second, any reasonable juror would certainly view the word as discriminatory. These factors therefore weigh in favor of the remark being probative of discriminatory animus. Although the timing of the remark is not a part of the record, it appears the remark was not made in relation to the AC hiring decision and was used in the context of a personal matter. Nonetheless, at the summary judgment stage, the Court considers the Chief's use of the word evidence at least somewhat probative of the question of gender discrimination, particularly when combined with the other evidence in the record. The court's holding in *McInnis* is again instructive. There, the court concluded "a causal nexus [could] be inferred" between Defendant's alleged discriminatory remarks and the result of the promotional process he led, even where Plaintiff and Defendant offered different interpretations of the same alleged comments. *McInnis*, 375 F. Supp. 2d at 83–84. Both there and here, "a reasonable factfinder could credit either interpretation." *Id.* at 84. As such, summary judgment is improper. Defendant is free to renew its argument concerning the probative value of the remark in a motion *in limine* prior to trial, however.

Certain other points bear noting. First, Plaintiff suggests that the oral examination panel's decision to consider the five-year plan Rosa brought to his interview is evidence of gender bias. *See* ECF No. 87 at 21–22. The Court does not find this evidence supports Plaintiff's claims of gender discrimination. While Plaintiff interpreted the email telling candidates that they could bring their résumé and cover letter to the interview as a rule *prohibiting* candidates from bringing other documents, it does not state as much. There is nothing in the record to suggest that if Plaintiff

had brought her own five-year plan to the examination, the panel would have rejected it. If anything, the evidence demonstrates Rosa's initiative, supporting Defendant's position that he was the better candidate. Likewise, Plaintiff also contends that Chief Marcarelli's decision to open the process to external candidates made the process more competitive and diluted the stark contrast between Plaintiff's and Rosa's qualifications, such that she was disadvantaged. *See* ECF No. 87 at 37. The Court, however, struggles to identify how this decision would not have equally disadvantaged Rosa (or all other internal candidates).

Finally, the Court rejects Plaintiff's effort to introduce evidence of Rosa being coached and asked an additional question during the interview. *See* ECF No. 87 at 41–42. Even if this is true, Plaintiff is unable to surmount the double hearsay problem the evidence presents. *See* Fed. R. of Evid. 805. Plaintiff asserts that she learned of the "coaching" Rosa received during the interview through Bryan Kollmer, a fellow firefighter, who in turn learned it from Rosa. ECF No. 87 at 22–23. While Rosa's statement may be one of a party-opponent and thus an exception to the hearsay rule—an issue the Court explicitly does not decide in this ruling—Kollmer's statement relaying what he heard from Rosa is not. Because the information is being offered for the truth of the matter, Plaintiff would also need to assert a valid hearsay exception to introduce this evidence, and she has failed to do so. Fed. R. of Evid. 805. Only admissible evidence can create an issue of material fact to defeat a summary judgment motion. *See Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008) ("In order to defeat a properly supported summary judgment motion, the opposing party must proffer admissible evidence that 'set[s] forth specific facts' showing a genuinely disputed factual issue that is material under the applicable legal principles."); *see also* Fed. R. Civ. P. 56(c), (e). As such, the Court has not considered this

evidence in this ruling. Should Plaintiff seek to introduce it at trial, she must file a motion *in limine* explaining why it is admissible.

In sum, viewing the record in the light most favorable to Plaintiff, as the Court must at this stage, a reasonable jury could conclude that Defendant discriminated against Plaintiff on the basis of her gender through its AC hiring process. Defendant is therefore not entitled to summary judgment on Counts One or Two.

## IV.    EQUAL PROTECTION CLAIM

For the reasons discussed below, Defendant's motion for summary judgment is GRANTED as to Plaintiff's equal protection claim.

### A.    Legal Standard

Together, 42 U.S.C. § 1983 and the equal protection clause of the Fourteenth Amendment protect public employees from various forms of discrimination, including disparate treatment on the basis of gender. *See Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006). Where both a Title VII claim and a § 1983 equal protection claim are raised in the same case, these claims generally "stand or fall together," as long as the plaintiff also establishes the employer acted under color of state law. *Martinez v. City of Stamford*, No. 22-702-cv, 2023 WL 3162131, at *3 (2d Cir. May 1, 2023) (quoting *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004)). With respect to causation, however, § 1983 equal protection claims are evaluated differently than Title VII disparate treatment claims: a plaintiff bringing a § 1983 equal protection claim must establish that but for the defendant's discrimination, the adverse action would not have occurred, whereas Title VII has a lower, "motivating factor" causation standard. *See Naumovski v. Norris*, 934 F.3d 200, 213–14 (2d Cir. 2019) ("a plaintiff pursuing a claim for employment discrimination under § 1983 rather than Title VII must establish that the defendant's discriminatory intent was a 'but-for' cause

of the adverse employment action"). Within the *McDonnell Douglas* standard, this distinction plays out at step three: "a § 1983 plaintiff must establish that the employer's stated non-discriminatory reason is either false or inadequate to support the adverse employment action." *Id.* at 215.

If a plaintiff pursues a § 1983 claim against a town or municipality, the municipality cannot be held liable for the actions of its employees under a simple *respondeat superior* theory; instead, the plaintiff must prove that the municipality, "through its deliberate conduct, was the moving force behind the injury alleged," under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690 (1978). *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 97–98 (2d Cir. 2020) (cleaned up) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997). "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Brown*, 520 U.S. at 404.

The Second Circuit has distilled the requirements of a *Monell* claim into three elements, holding that a plaintiff must plead: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right. *Agosto*, 982 F.3d at 97. A plaintiff may satisfy the policy or custom element by alleging, among other theories, "actions taken or decisions made by final municipal policymakers that caused the violation of plaintiff's rights." *Gomez v. City of Norwalk*, No. 15-CV-1434 (MPS), 2017 WL 3033322, at *3 (D. Conn. July 17, 2017). Whether an individual is a final municipal policymaker is a question of state law appropriate for court, rather than a jury, to resolve. *Agosto*, 982 F.3d at 98; *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 737 (1989) ("the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge

*before* the case is submitted to the jury"). State law, including "valid local ordinances and regulations," will "always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 125 (1988).

B. <u>Discussion</u>

Regarding causation, both Plaintiff's Title VII Claim and § 1983 claim assert that Plaintiff was denied the AC position solely because of her gender. She does not assert that gender was one factor among others that influenced this decision. As Plaintiff only asserts that "but for" her gender, she would have moved forward in the AC hiring process, the *McDonnell Douglas* analysis conducted in relation to Plaintiff's Title VII and CFEPA claims applies equally here. A reasonable jury could conclude that, but for her gender, Plaintiff would have received the AC position.

The Court must thus consider Defendant's argument that it is not liable under *Monell*, as it is a municipality. Plaintiff's *Monell* theory is that Chief Marcarelli was a final policymaker for the Town, such that the Town can be held liable for his actions under *Monell*. The Court disagrees, and concludes that summary judgment in Defendant's favor is appropriate as to Plaintiff's equal protection claim.

It is undisputed that the BOFC bears ultimately hiring responsibility for the AC position, not Chief Marcarelli. Plaintiff fails to identify any source of state or municipal law supporting the conclusion that Marcarelli had final policymaking authority with regard to the hiring process. Nor could she, as the East Haven Town Charter places hiring responsibility for all individuals except the Fire Chief in the hands of the BOFC. *See* East Haven Town Charter, Chapter VI, § 8(A) ("The Board of Fire Commissioners shall appoint and may remove, subject to such rules and regulations as may be adopted pursuant to the merit system provisions of Chapter VIII of this

Charter, subject to the provisions of applicable collective bargaining agreements, all officers and employees of the Fire Department, as hereinafter provided, excepting the Fire Chief.").

To circumvent the lack of state or municipal law supporting her position, Plaintiff asserts that because Marcarelli's hiring process decisions were discretionary and unreviewable, they constituted final policy decisions. The Second Circuit's holding in *Agosto*, however, forecloses this argument. There, the court held that "[i]t is not enough that an official had discretion to make a decision that was unreviewable. Rather, the official must have been sufficiently high up in the municipal hierarchy that he was responsible under state law for making policy in that area of the municipality's business." *Agosto*, 982 F.3d at 98 (internal citations and quotation marks omitted). Marcarelli was not responsible under state law for making final policy regarding hiring decisions for EHFD; the BOFC was.[7] Therefore, Marcarelli was not a final policymaker for *Monell* purposes, even where he had discretion to act and his actions were effectively unreviewable.

Because a municipality can only be held liable for actions by final policymakers and Plaintiff has not provided evidence to support the conclusion that Marcarelli was acting as a final municipal policymaker, the Court finds that summary judgment is appropriate for Defendant on Plaintiff's § 1983 claim.

## V.    CONCLUSION

For the reasons described herein, Defendant's motion for summary judgment is DENIED as to Plaintiff's Title VII and CFEPA claims (Counts One and Two) and GRANTED as to

---

[7] The mostly out-of-circuit cases Plaintiff cites in support of her position are inapposite, as they generally involve situations in which state or municipal law explicitly or implicitly provided police chiefs with policymaking authority over certain law enforcement decisions. *See, e.g.*, *Davis v. City of Apopka*, 734 F. App'x 616, 620 (11th Cir. 2018); *Trevino v. Gates*, 99 F.3d 911 (9th Cir. 1996); *Young v. City of Providence*, 396 F. Supp. 2d 125, 145 (D.R.I. 2005). In the one case Plaintiff cites from this district—which arose in the context of a motion to dismiss—the court specifically expressed no opinion about whether a police chief is a final policymaker, deferring the question to summary judgment. *Dingwell v. Cossette*, 327 F. Supp. 3d 462, 475 (D. Conn. 2018).

Plaintiff's equal protection claim (Count Three).

The Court will set a status conference to set dates for pretrial submissions and trial.

**SO ORDERED** at Hartford, Connecticut, this 26th day of November, 2024.

 */s/ Sarala V. Nagala*

SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE